

SIGNED.

Dated: September 19, 2013

*Randolph J. Haines*

**Randolph J. Haines, Chief Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| PETER PETER COTTONTAIL, LLC, | ) | Case No. 2:12-bk-23574-RJH |
| Debtor. | ) | |
| In re | ) | Chapter 11 |
| RANDANGO, LLC, | ) | Case No. 2:12-bk-23577-RJH |
| Debtor. | ) | |
| In re | ) | Chapter 11 |
| BERMUDA & THE BOULEVARD, LLC, | ) | Case No. 2:12-bk-23579-RJH |
| Debtor. | ) | |
| In re | ) | Chapter 11 |
| D & J PROPERTIES, LLC, | ) | Case No. 2:12-bk-23581-RJH |
| Debtor. | ) | OPINION RE: ENFORCEABILITY OF UNSIGNED LOAN MODIFICATION AGREEMENT |

The issue in this case is whether a loan modification agreement negotiated between the Debtors and Everkrisp Vegetables, Inc. ("Everkrisp") satisfied the Arizona Statute of Frauds or any of its exceptions. The Court concludes that the agreement did satisfy the Arizona Statute of Frauds, and even had it not, exceptions to the Statute of Frauds apply in this case to make the agreement's terms enforceable.

**Background Facts**

In March 2006, South Bethany 303, LLC ("South Bethany"), a predecessor-in-interest to the Debtors, purchased from Everkrisp approximately 38 acres of unimproved farmland in western Maricopa County. To secure payment, South Bethany executed a promissory note and Deed of Trust to Everkrisp. As additional consideration for the purchase, Everkrisp received the right pursuant to a lease agreement to farm the property rent-free until the promissory note was paid.

The original promissory note carried a principal of $2.385 million with a maturity date of July 19, 2011. Interest accrued at the rate of 8% per year, and the note provided for quarterly interest-only payments until the note was paid in full.

In April 2009, after South Bethany defaulted under the note, Everkrisp agreed to a loan modification that decreased the quarterly payment obligation and extended the maturity date to July 19, 2013. South Bethany transferred its interest in the property to the Debtors, and pursuant to the loan modification, the Debtors and Everkrisp executed Allonge No. 1 to the Promissory Note. Allonge No. 1 provided for half of the quarterly interest payment ($23,850) to be made to Everkrisp, with the other $23,850 to be added to the outstanding principal balance. The Debtors and Everkrisp also executed lease amendments adding the Debtors as the Lessors and extending the rent-free lease period.

On January 13, 2010, Randy Black, Jr., Manager for the Debtors, sent a proposal for another loan modification to Michael Etchart, Vice President of Everkrisp. According to the letter, the Debtors' partners were having difficulty raising capital to pay the interest on the property for the following twelve months. Black's proposal was a $70,000 payment to Everkrisp upon Etchart's acceptance of the proposal that would represent all interest owed for 2010. Quarterly payments would resume on January 1, 2011 at $23,850. Etchart signed the proposal on January 20, 2010, and the Debtors subsequently made the $70,000 payment on January 22.

In 2011, the Debtors had further problems raising capital and became in default on the first two quarterly payments of 2011. The Debtors and Everkrisp had discussions to further modify the terms of the promissory note, and the discussions resulted in terms that Etchart testified were acceptable to Everkrisp. In June of 2011, Everkrisp's counsel prepared a document titled Allonge

No. 2 to Promissory Note that contained the terms of these discussions. Allonge No. 2 provided that the outstanding principal balance would be reduced from approximately $2.8 million to $1.5 million, interest would no longer accrue on the loan, and quarterly payments of $25,000 would be applied to the principal. Payments due would begin retroactively in January of 2011, and Allonge No. 2 contained a provision making its terms conditioned upon the Debtor paying the then-delinquent January and April 2011 payments. The maturity date and rent-free lease period were also both extended to August 2015.

The events following the preparation of Allonge No. 2 are the subjects of contention between the parties. In an email to the Debtors dated June 22, 2011, Everkrisp's counsel attached Allonge No. 2 and requested the $25,000 January and April 2011 payments be made. July 7, 2011 the Debtors made a payment to Everkrisp in the amount of $50,000. The Debtors claim to have signed Allonge No. 2 and returned it to Everkrisp, but the Debtors have no delivery confirmation of such an act. Etchart testified that Everkrisp was planning on signing the agreement upon receiving a returned signed copy from the Debtors, but that they never did receive such a copy. Everkrisp also claims never to have signed any copy of Allonge No. 2. The Debtors, who claim to have been working under the terms of Allonge No. 2, made two more payments of $25,000: one in September 2011 that would have been the July payment, and another in March 2012 that would have been the October 2011 payment.

After repeated defaults of quarterly payments, in June 2012 counsel for Everkrisp sent the Debtors a notice of default for failing to make the required January and April 2012 payments. Regarding the debt, the letter only referenced the original principal amount of $2.385 million, the original promissory note, and Allonge No. 1. It made no reference as to specific amounts due or to Allonge No. 2, only indicating default under the January and April 2012 payments.

Following the default letter, Everkrisp commenced foreclosure proceedings, and their counsel sent another letter to the Debtors dated August 23, 2012 alerting them of a Trustee's Sale dated October 30, 2012. This letter included a detail of the loan payoff balance, as well as what Everkrisp would accept to reinstate the loan. The loan payoff balance was calculated using an

3

outstanding principal of approximatly $1.4 million. The loan reinstatement calculations requested delinquent principal payments for January, April, and July 2012 totaling $75,000, plus late fees and legal fees. These calculations were made pursuant to the terms of Allonge No. 2. On October 3, 2012, counsel for Everkrisp sent a follow up letter to the Debtors revising the totals using calculations under the terms of Allonge No. 1. This follow up letter revised the outstanding principal amount to $2.385 million, and noted that because Allonge No. 2 was never executed and contained a reversionary clause under events of default, the terms of Allonge No. 1 controlled.

The Debtors filed for Chapter 11 bankruptcy on October 29, 2012. Their proposed Plan of Reorganization provides for a cure of all defaults to Everkrisp and reinstatement of the loan pursuant to Allonge No. 2. Everkrisp filed a proof of claim for the amounts owed pursuant to Allonge No. 1. Everkrisp claims that Allonge No. 2 never controlled because, having never signed the document themselves, and never receiving a signed copy from the Debtors, it did not satisfy the Statute of Frauds. Though the Debtors do not have a copy of Allonge No. 2 signed by all parties, they claim to have signed and returned a copy to Everkrisp. The Debtors also claim that Everkrisp should be estopped from claiming the Statute of Frauds because the Debtors detrimentally relied on Everkrisp's actions in negotiating and drafting Allonge No. 2, as well as their actions in the time following its drafting. After supplemental briefing at the request of the Court and oral argument, the Court took the issue under advisement.

## Discussion

**The Statute of Frauds**

Modern statutes of frauds find their roots in a 1677 English statute, 29 Charles II, c. 3, An Act for the Prevention of Frauds and Perjuries.[1] This statute was intended to serve an evidentiary purpose by providing evidence of the existence and terms of a contract more reliable than easily fabricated oral claims.[2] The classes of contracts covered by the statute, including land contracts, were selected because of their importance or complexity.[3] Today, all 49 states, and the District of

---

[1] RESTATEMENT (SECOND) OF CONTRACTS ch. 5, Statute of Frauds, stat. note (1981).
[2] *Id.*
[3] *Id.*

4

Columbia, have enacted some variation on the original,[4] with Black's Law Dictionary defining the statute of frauds generally as "[statutes] designed to prevent fraud and perjury by requiring certain contracts to be in writing and signed by the party to be charged."[5]

In Arizona, for a promise or agreement related to the sale of real property or an interest therein to be enforceable, the promise or agreement upon which the action is brought, or some memorandum thereof, must be in writing and signed by the party to be charged or his authorized agent.[6] Also, an agreement to loan money, to grant or extend credit, or to renew or modify a loan or other extension of credit involving an amount greater than two hundred fifty thousand dollars that is not made or extended for personal or family purposes must be a signed writing.[7] A mortgage or deed of trust is an interest in real property for the purposes of the Arizona Statute of Frauds.[8]

Here, the parties agree that Allonge No. 2 falls within the scope of the Statute of Frauds. Following the 2006 purchase of the property, the subsequent executions of the Deed of Trust, the original promissory note, Allonge No. 1, and the loan modification proposal letter of January 2010 were all in accordance with the Statute. Thus, Allonge No. 2, being a memorandum of the oral agreement between the parties to modify the original loan documents, also falls within the scope of the Statute and must be signed by the parties to be charged in order to be effective. Because under Allonge No. 2 Everkrisp was to be charged with a reduction in the principal balance, its signature was required to satisfy the Statute.

**Allonge No. 2 satisfies the requirements of a Memorandum under the Statute of Frauds**

For a memorandum of an agreement to satisfy the Statute of Frauds it must "contain the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made."[9] The memorandum need not be a single document, and the document that has

---

[4] *Id.*
[5] BLACK'S LAW DICTIONARY 1545 (9th ed. 2009).
[6] Arizona Revised Statutes ("A.R.S.") § 44-101(6).
[7] A.R.S. § 44-101(9).
[8] *Snyder v. HSBC Bank*, 873 F.Supp.2d 1139, 1150 (D. Ariz. 2012) (citing several Arizona cases).
[9] *Register v. Coleman*, 633 P.2d 418, 421 (Ariz. 1981).

5

been "signed by the party to be charged" may be one of several documents, so long as they can be attributed to each other with certainty.[10]

Here, the parties are not in dispute that the Allonge No. 2 document, as drafted by Everkrisp's counsel, contained the terms and conditions of all the promises constituting the contract between them. It is clear that because it was not signed, it cannot suffice as a memorandum of the oral agreement between the parties per se. However, the email from Everkrisp's counsel to the Debtors attaching the drafted agreement, and the August 23, 2012 loan payoff and reinstatement letter calculated using Allonge No. 2's terms, both signed by Everkrisp's counsel,[11] adequately supplement the Allonge No. 2 draft. When examined together, these documents serve as a memorandum proving the existence of an agreement between the parties, thus satisfying the Statute of Frauds.[12]

**Even absent the memorandum satisfying the Statute of Frauds, Allonge No. 2 is enforceable under exceptions to the Statute**

"Arizona courts . . . have long recognized limited exceptions to the statute [of frauds]."[13] "The cases reason that because the statute is intended to prevent fraud, specific performance of an oral contract is sometimes required to prevent the statute from becoming 'an instrument by which fraud is perpetrated.'"[14]

The Court will limit its analysis to the exceptions that are most relevant to this case.

**Part Performance and Estoppel**

---

[10] *Daley v. Earven*, 639 P.2d 372, 375 (Ariz. Ct. App. 1981); *Favour v. Joseff*, 494 P.2d 370, 375 (Ariz. Ct. App. 1972).

[11] The email was electronically signed. In Arizona, "An electronic signature satisfies any law that requires a signature." A.R.S. § 44-7007(D). There are some elements related to the preceding statute that must be present; however, we need not analyze this case for such facts because it is sufficient that the loan payoff and reinstatement letter contained a written signature.

[12] There is authority in Arizona stating that documents prepared by an attorney authorized to act for a party, as was Allonge No. 2, serve as a "writing by the person to be charged" to satisfy the Statute of Frauds. *Fotinos v. Baker*, 793 P.2d 1114, 1116 (Ariz. Ct. App. 1990). This would make the Allonge No. 2 document sufficient for the Statute on its own. Given the existence of the additional documents in this case that, taken together, satisfy the Statute, such a holding is not necessary here.

[13] *Owens v. M.E. Schepp Ltd. P'ship*, 182 P.3d 664, 667-68 (Ariz. 2008).

[14] *Id.* at 668 (quoting *Trollope v. Koerner*, 470 P.2d 91, 97 (Ariz.1970)).

6

"It is well established in Arizona that a party may be equitably estopped from asserting the Statute of Frauds as a defense."[15] "The 'part performance' exception to the statute of frauds is grounded in the equitable principle of estoppel."[16] The doctrine of estoppel by part performance may be applied to take an agreement outside of the Statute of Frauds when the party asserting the Statute of Frauds took actions that induced or permitted another party to change his position to his detriment in reliance on an oral contract that would normally be within the Statute, and injustice can be avoided only through specific performance.[17]

As the Arizona Supreme Court explained in *Owens*:

> [A]cts of part performance serve an important evidentiary function—they excuse the writing required by the statute because they provide convincing proof that the contract exists. (citations omitted). So that this exception does not swallow the rule, acts of part performance take an alleged contract outside the statute only if they cannot be explained in the absence of the contract.[18]

The standard in *Owens* is derived from a decision by Justice (then Judge) Cardozo in which he wrote: "There must be performance 'unequivocally referable' to the agreement, performance which alone and without the aid of words of promise is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing."[19]

The "unequivocally referable" standard is used to ensure that the claimed acts of part performance truly serve the evidentiary function originally intended by the Statute of Frauds. It assists courts by eliminating the need for multiple levels of inference in determining whether the acts claimed evidence the existence of an agreement.

In this case, the Debtors' acts following the negotiation of Allonge No. 2 are clearly unequivocally referable to having an agreement in place for a loan modification. Allonge No. 2

---

[15] *Dollar Tree Stores, Inc. v. Bayless Inv. & Trading Co.*, No. 2:10-cv-2055, 2011 WL 6032966, at *5 (D. Ariz. Dec. 1, 2011) (citing *Del Rio Land, Inc. v. Haumont*, 574 P.2d 469 (Ariz. Ct. App. 1977)).

[16] *Owens*, 182 P.3d at 668 (citing *Gene Hancock Constr. Co. v. Kempton & Snedigar Dairy*, 510 P.2d 752, 755 (Ariz. Ct. App. 1973)).

[17] *William Henry Brophy Coll. v. Tovar*, 619 P.2d 19, 22 (Ariz. Ct. App.1980) (citing *Gene Hancock Constr. Co. v. Kempton & Snedigar Dairy*, 510 P.2d 752 (Ariz. Ct. App. 1973)); *Owens*, 182 P.3d at 668-69 (citing Restatement (Second) of Contracts § 129 (1981)).

[18] *Owens*, 182 P.3d at 668).

[19] *Id.* (quoting *Burns v. McCormick*, 135 N.E. 273, 273 (1922)).

7

specifies that its terms are contingent upon the Debtors submitting two late payments of $25,000 each. Just over two weeks after receiving Allonge No. 2, as drafted by Everkrisp, the Debtors made a $50,000 payment to Everkrisp.[20] The next two, and final, payments made by the Debtors to Everkrisp were also $25,000 each, with the exception of some minor additional fees added. The amounts of these payments matching the exact terms of Allonge No. 2 makes their part performance "unequivocally referable" to the existence of a loan modification agreement.

However, in order for Everkrisp to be estopped from asserting the Statute of Frauds, notwithstanding the Debtors' part performance, Everkrisp must have taken actions to induce or cause the Debtors to change their position to their detriment in reliance on such actions.[21] The Debtors' detrimental reliance must be more than simply paying a portion of the purchase price as they did.[22]

In this case, Everkrisp drafted Allonge No. 2 and sent it to the Debtors along with a request that the delinquent $50,000 be paid. They also continued accepting payments of $25,000, pursuant to the terms of Allonge No. 2, for a period of almost twelve months before initiating default proceedings. Their initial loan payoff and reinstatement letter of August 23, 2012, though amended by the revised letter, indicated to the Debtors that Everkrisp was operating under the terms of Allonge No. 2. These actions are sufficient to cause a reasonable person to change his position to his detriment in reliance on an agreement such as Allonge No. 2 being in place.

Everkrisp maintains that the Debtors' only reliance in this case is having made payments that were otherwise owed, and pursuant to the holding in *Del Rio Land, Inc.*, the Debtors should be barred from claiming estoppel by part performance. However, Black testified that had the Debtors

---

[20] Everkrisp claims in its brief, and Etchart testified, that when sending their draft of Allonge No. 2 to the Debtors they told the Debtors that they had only one more week to pay the delinquent payments or the potential deal was off. However, the email Everkrisp produced as evidence, in which their counsel sent an attached Allonge No. 2 to the Debtors, only states that they "request" the delinquent payments be made that week. The lack of a clear deadline and ultimatum, followed by acceptance of the payments, belies Everkrisps claim. Further, Everkrisp's consistent acceptance of late payments up until that point evinces a less-than-strict enforcement as to the timing of payments.

[21] *William Henry Brophy Coll.*, 619 P.2d at 22.

[22] *Del Rio Land, Inc.*, 574 P.2d 469, 475 (Ariz. Ct. App. 1977) ("[P]ayment of a portion of the purchase price alone is not such a detriment or such part performance as will create an estoppel or part performance removing the bar of the Statute of Frauds.").

not been operating under the understanding with Everkrisp that Allonge No. 2 was in effect, the Debtors would have chosen to allow Everkrisp to foreclose on the property under the terms of Allonge No. 1.[23] Consequently, the Debtors' detrimental reliance on Allonge No. 2 being in effect is twofold: First, they made payments to Everkrisp in excess of $100,000 pursuant to Allonge No. 2's terms. Second, they chose to attempt to maintain ownership of a property that they believed to be worth, at the time of the negotiations, approximately $1.5 million instead of the $2.8 million they owed under Allonge No. 1. This reliance rises to a level greater than simply paying a portion of the purchase price as in *Del Rio Land, Inc*.

Everkrisp points to a recent case in which a borrower was unable to enforce an alleged loan modification that she had been the only party to sign.[24] The plaintiff had failed to make the payments required under her original loan, resulting in HSBC issuing a notice of default and initiating foreclosure proceedings. HSBC cancelled a scheduled foreclosure sale following negotiations between the plaintiff and the loan servicing agent, at which the plaintiff claimed to have negotiated a loan modification agreement ("LMA") that HSBC approved. However, the copy of the LMA that she could produce contained only her signature. Following the LMA negotiations, the plaintiff made nine months of payments and received monthly statements from HSBC showing her reduced principal, deferred principal, and the reduced interest rate, all in accordance with the LMA. Yet, after she paid the tenth modified payment the loan servicing agent returned her last check and reinstituted foreclosure on the home; Snyder claims that neither the servicer nor HSBC returned any of the other previous nine modified payments.

Everkrisp states in its brief that the court in *Snyder* held that the plaintiff could not overcome the Statute of Frauds using a part performance exception. Everkrisp reasons that if the court in *Snyder* could not allow an exception to the Statute, the facts here should preclude the Debtors from

---

[23] This is based on the premise that the promissory note was only guaranteed by the LLCs, and not anyone else personally; Everkrisp's only recourse would have been to foreclose on the subject property of the note. Everkrisp argues that there was recourse liability under this loan and that they would have had the opportunity to seek additional recourse against the LLCs. However, it is unclear that the LLCs had any other assets at the time significant enough for Everkrisp to take action against. Thus, this loan was effectively non-recourse.

[24] *Snyder v. HSBC Bank*, 873 F. Supp. 2d 1139 (D. Ariz. 2012).

9

claiming the part performance exception. However, Everkrisp fails to recognize the nature of the analysis performed by the court in *Snyder*. First, the court was considering the defendants' Rule 12(b)(6) motion.[25] In order to survive a Rule 12(b)(6) motion, "[t]he factual allegations of the complaint must be sufficient to raise the plaintiff's right to relief above a speculative level."[26] The *Snyder* court did not issue a holding regarding the Statute of Frauds and its possible part performance exception in that case; its discussion regarding this issue was *dicta*. Instead, it dismissed the claim without prejudice because the plaintiff failed to raise these issues in her complaint.[27] The plaintiff did file an amended complaint resulting in a case quite distinct from its predecessor in that the Statute of Frauds and any of its possible exceptions were not at issue.[28] Neither *Snyder* opinion is dispositive in this case.

Because the Debtors relied to their detriment on Everkrisp's actions indicating Allonge No. 2 was in effect, and performed in-part sufficiently in a manner unequivocally referable to the existence of the agreement, the part performance exception to the Statute of Frauds applies in this case.

**Admission Exception**

"An admission under oath by the party opposing enforcement of an oral contract that the contract exists can take the agreement outside the statute of frauds."[29] The *Owens* court bases its rule in part[30] on a Seventh Circuit decision from Judge Posner stating that "the judicial admission

---

[25] *Id*. at 1147.
[26] *Id.* (citation omitted).
[27] After reviewing generally the rules in Arizona regarding the Statute of Frauds and the part performance exception, the court states "It is unclear whether Plaintiff is claiming the part-performance exception to the Statute of Frauds applies in this case. . . . The Court will permit Plaintiff to file an amended complaint to allege a plausible claim if she is asserting the part-performance exception." *Id.* at 1151.
[28] Despite the LMA only being executed by the plaintiff, HSBC and the loan servicing agent actually concede in the second *Snyder* case that there was an LMA in effect between the parties. *Snyder v. HSBC Bank*, 913 F.Supp.2d 755, 762-65 (D. Ariz. 2012). The defendants did not attempt to void the LMA in their finding the plaintiff in default; instead, they claimed that the plaintiff did not pay the full payments pursuant to the LMA because she only paid principal and interest, neglecting to include escrow amounts required by the LMA. *Id.* at 762.
[29] *Owens v. M.E. Schepp Ltd. P'Ship*, 182 P.3d 664, 671 (Ariz. 2008) (citations omitted).
[30] *Owens* also relies on sections of the Restatement and Corbin on Contracts in stating this rule. *Id. See* RESTATEMENT (SECOND) OF CONTRACTS § 129 cmt. d (1981) ("[The requirement of acts unequivocally referable to the oral agreement to prove an agreement] is not insisted on if the making of

10

Case 2:12-bk-23574-MCW    Doc 126    Filed 09/19/13    Entered 09/19/13 15:37:06    Desc
Main Document    Page 10 of 12

exception is 'a common-sense' recognition that if the defendant admitted in a pleading that he made a contract with the plaintiff, the purpose of the statute of frauds—protection against fraudulent or otherwise false contractual claims—was fulfilled."[31]

Etchart's testimony therefore provides evidence that Allonge No. 2 existed as an agreement between the parties. He testified that the terms of Allonge No. 2 as negotiated were agreeable to Everkrisp at the time negotiations were concluded. He further testified that his intention in having his counsel send Allonge No. 2 to the Debtors was that after the Debtors signed and returned it, he would sign it himself. With Etchart's admission under oath that there was in fact an agreement between the parties in the form of Allonge No. 2, it would run counter to the purpose of the Statute of Frauds to hold that, because Everkrisp did not sign the document, no agreement existed. Therefore, his admission provides an exception to the Statute of Frauds in this case.

**Promissory Estoppel and the Second Promise Exception**

Everkrisp also argues that estoppel can overcome the Statute of Frauds only if, in addition to the alleged agreement, there was a "second promise" that the agreement had been or would be signed.[32] Everkrisp reasons that because they never told the Debtors that Allonge No. 2 had been or would be signed, the Debtors' claim of estoppel should be barred. However, we find this argument inapplicable here. The court in *Mullins* stated "the doctrine of promissory estoppel applies to a contract otherwise barred by the Statute of Frauds . . . where the party asserting the Statute of Frauds defense has misrepresented that the statute's requirements have been met or promises to put the agreement in writing."[33] The courts in both *Mullins* and *Tiffany* were considering claims for damages and the preclusion of using the Statute of Frauds as a defense by invoking the doctrine of promissory estoppel. Promissory estoppel is distinct from estoppel using the part performance doctrine in that the former may be used in an action for damages, while the

---

the promise is admitted or is clearly proved"); and 4 CAROLINE N. BROWN, CORBIN ON CONTRACTS § 14.2, at 175-80 (Joseph M. Perillo ed., rev. ed. 1997).

[31] *Owens*, 182 P.3d at 671 (quoting *DF Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir. 1988).

[32] In their brief, citing *Mullins v. S. Pac. Transp. Co.*, 851 P.2d 839, 841 (Ariz. Ct. App. 1992).

[33] *Mullins* at 841 (citing *Tiffany Inc. v. W.M.K. Transit Mix, Inc.*, 493 P.2d 1220, 1226 (Ariz. Ct. App. 1972)).

11

latter is only available to a party seeking an equitable remedy.[34] Here, the Debtors are not seeking damages, so the doctrines of promissory estoppel and the "second promise" are not applicable.[35] The analysis of the part performance and admission exceptions provided by the *Owens* court is sufficient to find exceptions to the Statute of Frauds in this case.

## Conclusion

The Court finds that the documents related to Allonge No. 2 together are a sufficient memorandum of the agreement to satisfy the Statute of Frauds. The Court further finds that, had these documents not satisfied the Statute, the part performance and judicial admission exceptions apply to overcome the Statute.

DATED AND SIGNED ABOVE

---

[34] *Arnold & Assocs., Inc., v. Misys Healthcare Sys.*, 275 F. Supp. 2d 1013, 1022-23 (D. Ariz. 2003); *Trollope v. Koerner*, 470 P.2d 91, 98-99 (Ariz. 1970).

[35] The original *Tiffany* rule is based on Comment f to the RESTATEMENT (FIRST) OF CONTRACTS § 178 (1932), a section and comment that no longer appear in the RESTATEMENT (SECOND) OF CONTRACTS (1981). *Tiffany*, 493 P.2d at 1225-26. Indeed, in its discussion on estoppel as it relates to the Statute of Frauds, the Arizona Supreme Court recently relied in part on the Second Restatement and makes no reference to the "second promise" required in the First Restatement. *Owens*, 182 P.3d at 668-69.